Good morning, Your Honors. Charles Fleischman, appearing for the Plaintiff and Appellant. This is a case where my client was entitled to a risk of disability benefits through her employer's disability plan. The plan was insured by Met Life Insurance. One certificate in the summary plan description clearly said that the, well, in order to determine how much she's supposed to get, you have to look at her basic monthly earnings. And basic monthly earnings are defined in one certificate and one summary plan description as earnings, including overtime and bonuses from the prior calendar year as reported on the W-2. Clearly, the W-2 in this case, and there's a real clear copy of it at Excerpts of Record 132, shows that she was making substantially her earnings from 1998, substantially more than what was used to calculate. Well, counsel, the difference, as I understand it, were stock options. And it wasn't crystal clear to me how in Ms. Hawkins-Dean's employment stock options figured. Did she earn a comparable amount from stock options every year of her employment, or was this just kind of a one-time? First of all, it wasn't from the we don't know if it's just from stock options. That's what the Defendant was alleging. But there was no evidence in the administrative record saying that it was just from the exercise of stock options. As a matter of fact, there is an indication that it was not only stock options, but it was an actual grant of stocks themselves. And if you look at Excerpts of Record — I'm sorry, Supplemental Excerpts of Record, page 123, the first paragraph, it says, I am pleased to announce that your company has granted you stock options and restricted stock for your 1996 service. And there's other indications for the other years. But my question was, how frequently did that occur during her employment? Was that a one-time thing, or? She received them every single year. There are, in the Excerpts of Records, there are the W-2 forms, I think, from 1995 through 1999, showing that she received an ever-increasing proportion of her salary in the form of stock and stock options. Okay? So that was most of her earnings from her employment was in the form of the stock and stock options. But as part of her compensation package, did they include stock options? Yes. It increased every year on her W-2. Well, no, there's a difference. I mean, you know, your compensation package is your commissions, bonuses, you know, for particular success in a particular project or something. And stock options, you know, may or may not be part of your compensation package. Well, I don't know exactly. There's nothing in the record that shows exactly what her compensation package was. All we know is what she was earning, what she was being paid for. And she got it fairly regularly, as in your answer to that Singleton's question. Yes. That's all we know, is that every year, that's how she was compensated for her work, was with a base salary in stock and stock options. Let me ask you this. Doesn't your argument really turn on what the standard of review is, whether it's de I don't think so. Why not? Well, because I think it's pretty clear that you're supposed to look at the W-2. And under the clear meaning of the language, regardless of what the standard of review is, you look at the W-2, she's making the W-2. Well, you can look at the W-2 and it's confusing. No. You look at the W-2, and I think it's pretty clear she's making wherever you look. Well, let's see. What is the year in question here? 1998. And if you look at excerpts of Record 132, I think it is. But the plan, both the plan and the STD, define the compensation as basic monthly income. I'm sorry, I didn't hear you. As I understand it, the stock options were like at one time during the year, she might get stock options. But the plan, as I read it, defines the benefits to be paid as basic monthly. Yes. So you're saying, so what, to read, to just look at the W-2, you're not really looking at what she earned each month. You're looking at what she earned for the whole year. She earned commissions. She did not earn a basic salary every month. She was paid by way of commissions. And defendant tells us in this brief, in their brief, that she was paid by way of commission. That was her basic salary. It wasn't a monthly. She didn't have a basic monthly salary. No. The fits within the definition of a monthly. But the definition in this policy, or in two of the forms of the policy, say that you determine the monthly amount by taking the prior year's W-2, the 1998 W-2, and that's again at excerpts of Record 132, and dividing it by 12. And that's exactly how you find it. And it's not, you don't look at any particular month. You take the whole amount, whether it was paid all at once or in 12 installments or in five installments, and you divide it by 12. And that's her basic monthly earnings. Okay. So in that year, say she got stock, I mean, does it depend on whether she exercised the stock options? Or, I mean, to appear on her income, wouldn't you have to exercise the options? Well, I try to bring out to the trial court, and if you look at the transcript of the argument there, that and I don't know what the answer to this, but some stock options have an absolute value at the time they're issued. Some stock options don't have a value for IRS purposes until they're executed until they're, until the options are executed. And I don't know what it is with these stock options, and there's nothing in the administrative record to show it. But we do know, however these were valued, whether these were valued at the time of the execution or at the time she received them, she was taxed on them, and they appear in her W-2. And that's, it's just, they, the policy says look to the W-2. It tells you, it tells you the formula. Well, that's the summary plan description says take a look at the W-2. There's three documents that, that, that tell us about the policy. And two of them say look to the W-2. Well, counsel, Judge Paez asked you initially whether the standard of review would significantly affect, if not determine, the outcome in this case. De novo review would require the court, of course, to, to, to make essentially a contractual determination after considering all the evidence, and hold a trial if there were disputed issues of material fact regarding intent. Abusive discretion review simply requires that the, the plan administrator not engage in a, a irrational interpretation either of the plan or of the need for benefits. So if there's ambiguity in the plan documents regarding the calculation of the monthly benefit, then the, doesn't the abusive discretion standard allow a decision that would resolve the ambiguity favorable to the, favorable to the plan? Not in this circuit. In the Ninth Circuit, we have, in a RISA case, we have Patterson v. Hughes. We have, we have Long v. Long, Long-Term Disability Plan, Lang v. Long-Term Disability Plan. And we have Coonan v. I think it's Benefit Trust, that says when you have an insured plan, and this is pointed out in Winners v. Costco, when you have an insured plan, Winners v. Costco was an uninsured plan, but when you have an insured plan, the doctrine of contraprofarentum applies. And so even under abusive discretion review. And so when you have an ambiguity in an insured plan under abusive discretion review, you must interpret it most favorably, take a reasonable interpretation most favorable to the claimant. So, so it wouldn't make any difference. Well. It would be easier, though, if it were. If it were de novo. De novo. Yeah. Would it be easier? It would be easier, wouldn't it? Well, yes. Under de novo review, you would, you would also, that's Lang v. Long-Term Disability Plan. You would have to apply contraprofarentum also. But in reasonable expectations, the Saltarelli case. So why don't we do de novo here? In my opinion, either way, whether you do de novo or abusive discretion, the result is the same. Under abusive discretion. Well, I understood you to make an argument that de novo applied here because, you know, in the initial state, she initially applied for benefits. They were denied. Yes. And apparently nothing changed until, unless, until the lawsuit was filed. Until summary judgment was filed. And then at the summary judgment stage, they said, well, changed her mind. Filed the benefits. And so the, either, I can't, it's not clear to me because, I mean, that part of the case is not part of this record. But it's not, it's not clear to me whether, they just said, we've reassessed and we now determine she's eligible. Or whether the district court said, no, this is a wanton abuse of discretion. It's not clear to me. Okay, well. But anyway, there could be a basis, change in a position. You know, nothing, there was no change in evidence. Nothing happened. They just suddenly said, well, now she's eligible. Well, that's what I argued. Brown versus. Right, Brown. Yes. That they just changed the position without any change in the facts. And the way to clear it up, I think it is reflected somewhere in the administrative record, in the excerpts or the supplemental excerpts. I got a call just before filing the motion for summary judgment from Mr. Foshay who said, we're going to pay the, we agree that she's disabled or we're going to pay her the benefits without agreeing on the benefits. But that never happened. Does this policy contain a clause that says that the insurer, that the plan administrator shall in its sole discretion make the decision as to whether benefits are due or the amount of benefits? Yes. It says the plan administrator. But this is another thing. The plan administrator in this case is not MetLife. The plan administrator is Herbert Half, the employer. So it says the plan administrator has discretion. It doesn't say MetLife has discretion. And this is a case, I didn't argue this, but this is a case of Nelson v. EG&G where it says when the wrong, when the party that isn't delegated authority makes the decision, review is de novo. And this is a case where it says, if I could find it, if you look at, well, it says the plan administrator and other fiduciaries have the discretion. But it doesn't name who the other fiduciaries are. And it could be anybody. There's even case authority that an insurance company of an ARISA disability plan is not a plan fiduciary. So MetLife is not explicitly given that discretion. I didn't raise this argument. So if it's not given that discretion, why are we doing the standard of review of abuse of discretion? If they're just calculating the amounts? I'm sorry, I didn't. Okay. If they're not, if this is not in their discretion, why are we using a standard of abuse of discretion? Well, the trial judge used abuse of discretion. He said that was a standard of review. But why? I don't know. I argue that it should have been de novo. I didn't raise it. But you didn't appeal that. Huh? But you did not make that. Oh, yeah. No, no. It's in my brief. That was one of the grounds for appeal here. I did not make that particular argument about MetLife not being the plan administrator who was granted discretion. My argument was that they changed. It was the Brown case. And also there's another Ninth Circuit case that says when you've got somebody that was, didn't act right in the first place, you don't have to give them discretion later on. Well, see, if they're not, if they're not controlled by the discretionary clause because they're not the plan administrator, I mean, if they're not bound by it, then I don't know why we wouldn't do de novo review. That's right. You don't know? I don't know. What's the case law that would say if they're not, if they're not subject to the discretionary clause, why wouldn't we do de novo review? Well, if you did de novo review, then lang versus long-term disability would apply, and you would apply contra pro forentum, and my client would get the most beneficial interpretation of the plan. Because if we're using a various deferential standard of review, we would say, well, they're the plan administrators, so they know what their plan says and how they interpret it. We do a de novo. We look at this as a contract, and we see that there's ambiguity, and then we would interpret it in favor of your client. Well, I agree. But also under my position is also under abusive discretion. One, you can't interpret a plan contrary to the plain language of the plan. And the plain language of the plan is that you have to look to the W-2. And two, under abusive discretion, contra pro forentum also applies to insured plans, and this is an insured plan. So under either theory, whether it's de novo or abusive discretion, you have to apply a contra pro forentum, which gives my client the benefit of the best reasonable interpretation. And the fact that there's a conflict between the SPD and the certificate or two certificates on the SPD, that goes in favor of my client, too. That's the Brecht case. Ginsburg. Do you want to reserve some time? Yes. Thank you. Can I point out one more thing? Well, okay. Okay. But you'll lose your reserved time. Okay. I'll reserve the time. Good morning. May it please the Court. First, I would simply respond to something Mr. Fleischman raised with respect to whether or not the plan documents in this case adequately confer discretion upon MetLife to interpret the plan and determine eligibility for benefits. And in the excerpts of record and in the supplemental excerpts of record, in the excerpts at page 68, the supplemental excerpts at page 69, it says that the plan administrator and other plan fiduciaries shall have that requisite discretionary authority. There are no other plan fiduciaries that could possibly have any impact on this determination. Well, is there a case law that says that an insurance company like MetLife here, that they are a fiduciary here? Yes, Your Honor. I think the IT versus Connecticut General is, I believe. Is that a Ninth Circuit case? Yes. IT? Versus, I believe it's Connecticut General. When the insurance company is making the decisions regarding who is entitled and determining whether somebody is entitled to benefits, then that insurance company is a fiduciary for those purposes. And MetLife would concede for the purpose of this case that it is a fiduciary in making these determinations. Okay, so you're a fiduciary to determine both eligibility and the amount, the calculation of benefits under this plan? That's correct, Your Honor, although eligibility was not an issue in the case. Well, I mean, it was in the prior case. Well, yes, I would sort of make a slight distinction between eligibility and whether she's entitled to benefits. I mean, eligibility is a fairly simple test to satisfy. She's an employee. She's covered by the terms of the plan. Entitlement to benefits is that she satisfies whether she's disabled or not. So not to split too fine a hair with you. Are you aware of the Department of Insurance's March 2005 order? Are you aware of that order? I am, Your Honor, and it's my understanding that several cases have held that it effectively has no role in this consideration. Several cases prior to the March 2205 order held that preliminary orders to that one had no role in the consideration. But now it seems that Commissioner Garamendi has issued an order saying all contracts of insurance with an insurance company that have that sole discretion clause are unconscionable. I'm familiar with Commissioner Garamendi's order, and my understanding was that several cases decided subsequent to that order have concluded that it does not apply in these cases. Well, we spent a considerable amount of time yesterday reviewing all those cases, and that certainly isn't my understanding. I think the distinction is between what had been said up until this past month and a decision reached in the middle of this past month to withdraw approval in all cases, including cases in which approval had previously been granted. Up until that time, the Commissioner was taking the view that because the approval would be denied, but the Commissioner had not taken the view that previously granted permission would be revoked. And that's the distinction, I think, that Judge Wardlaw is referring to. And, of course, since it happened in the middle of last month, there hasn't really been chance for that issue to percolate up through the district courts. And I'm sorry, Your Honors, I have not recently reviewed all those cases other than in general and within the last several weeks with respect to what I've previously represented. Right. But the implications of that, because if it's a change in California law, it's going to have to be litigated to the extent that change in California law interacts with ERISA and how the two will be applied. I mean, is this law preempted by ERISA plans, or is this because you're an insurance company, is this permissible for the state to regulate this and deem your contracts, such as this one, unconscionable because it's charged with, it has the power and authority to approve insurance contracts in the state of California. So I think that I don't have, we don't have the plan, I don't have the plan in front of me in this case. This seems to be a different kind of dispute, because in the cases we considered yesterday, we were talking about entitlement to benefits, and this is now calculation of benefits. But if I were to look at this under de novo review, I do think there's a different result under each standard. Well, Your Honor, I would, of course, respectfully disagree with the conclusion that a different outcome is compelled if de novo standard of review is applied versus abusive discretion standard. Why don't you argue that point? Well, the, obviously the, all of the governing documents were silent with respect to the issue of whether or not stock options are factored into the definition of basic monthly earnings, and the Court is obviously well aware of that fact. Right. But what about the W-2? Did you look at the prior year's W-2? Well, I'm familiar with what they've said. They were submitted during the course of the administrative review process to MetLife, and it does appear that the plaintiff realized income or profits from the sale of, my assumption, and I agree with Mr. Fleischman that the record is not completely well developed as to what triggered the placement of the stock options on the W-2 form. It is clear that the amount that we're concerned about here from the W-2 is stock option income. It's not restricted stock. It's nothing else because you can look at supplemental excerpts of record, page 144, and there's a listing of Robert Half Codes, one of which is STKOP, and that corresponds with stock options. So, and it's that STKOP designation in the W-2 form that Mr. Fleischman referred the Court to, which is next to the disputed amount of income that we're talking about here. And it strikes me that if we take the position that the only possible way that an insurer can avoid inclusion of that stock option income as a component of basic monthly earnings is to specifically exclude it from the definition, then we really find ourselves on a very, very slippery slope where theoretically. Doesn't that seem to be the easiest thing to do? We're not going to factor your monthly income. We're not going to include stock option, income from stock. You just have to say that. What's wrong with that? I mean, why do you have to? Well, that's the argument that's been made. Pretty good one. Well, I think that it's good at sort of a superficial level, but when we dive into what would be required to apply it at a practical level, you have insurers who are offering these group disability policies to, in this case, it's a fairly large employer. It looks to me as if Robert Half was ordering 6,000 summary plan descriptions, and that's somewhere there in the administrative record, and I apologize for not having the site directly to it. But some of these employees presumably qualify for grants of stock options. Some may not. I don't know. But there's lots and lots of types of income that ordinarily wouldn't be considered the kind of thing that would be underwritable, and this is exactly one of them. It's entirely up to you. It's excluded. Well, I suppose it would be simple enough to exclude stock option, income from every single policy that they issue.  Well, we're only talking about stock options for the moment. Well, we are, but I think the policy we have to examine whether or not the only way. All these policies are negotiable. The insurance companies have marketing reps and sales people. They go around to the employers and they market these policies. There's negotiations, go back and forth. There's all kinds of things that can happen in this process of working out a long-term disability plan at a price that the employers are willing to pay and that the insurance company is willing to underwrite. Well, I agree that that's certainly possible, but I would also point out that that did appear to happen in this case and Robert Half, regardless of what the policies say, Robert Half took the position that stock options were not, were specifically excluded from the calculation of basic monthly earnings, and that's been. Is that in the record? Yes, Your Honor, it is. First of all, this is sort of the second step, but at page 112 of the supplemental excerpts of record, there's a reference in a diary note to a telephone call that was made from MetLife to Robert Half, and then also Robert Half supplied MetLife with the underlying documents that it gave, presumably to its employees when they were asked to provide these calculations of earnings. And if, just bear with me. You're talking about this definition of compensation analysis? It's a calculation of, a greater than calculation. It appears at page 116 of the supplemental excerpts of record. Item number three, it says, deduct stock options and restricted stock. And again, this, the document is entitled greater of calculation for basic life insurance, voluntary life insurance, and LTD. So even if we focus on the reasonable expectations of the parties to the contract, certainly the reasonable expectations of Robert Half. Was this ever given to Miss, what's her name? It was provided. Hawkins-Dean. Hawkins-Dean? It was provided. No, during the course of her employment. I'm unaware of that, Your Honor. This was a confidential document that her employer maintained. It says confidential. Confidential, about six times. So this was part of the agreement between the company and Metro. MetLife. MetLife. But it was not information that was given to Miss Hawkins-Dean as part of her information about her insurance. I have nothing to indicate that it was provided as one of the governing plan documents. I also, however, might take issue with the notion that this particular document, page 116, was somehow confidential or secret. Because while the e-mail on page 115 from someone at Robert Half to Laura Sullivan at MetLife is labeled confidential, I don't see that the document itself is. Well, is there anything in the record to show that this was given to Miss Hawkins-Dean? Not, Your Honor, not other than in connection with the communication. After the decision was made. Correct. All right. Let me just ask you, you know, I think Judge Wardlaw sort of hit it on the head for me, kind of. I do think that the standard of review is significant here. I'm putting aside the commissioner's actions recently. Why don't we apply a de novo standard of review here in light of what happened on the benefits and the eligibility determination, which apparently MetLife changed its position from denial to grant without any significant, without at least, I can't tell from the excerpts of record that were given to us without any change in the facts of her condition. Apparently somebody, maybe a lawyer, looked at this and said, we're going to lose. Might as well just give her the benefits and get it over with. I don't understand. I mean, the case law seems to suggest when you change your position like that, you know, you're not entitled to the discretion. The cases in which that issue has arisen involve situations, most often, in which a plaintiff or a participant in a plan presents with one physical condition which never changes, and initially the plan fiduciary or insurance carrier agrees to pay benefits, and subsequently without there being any change in the plaintiff's physical condition decides to terminate benefits when there's been no indication that whatever his or her condition was that prompted the payment of benefits in the first place has changed. Here, frankly, although the administrative record with respect to the underlying case as to what payment of benefits really isn't before the court, one aspect of it that is before this court is the surveillance that was conducted. And, you know, MetLife came to the conclusion at that time that given all the circumstances, the plaintiff just did not suffer from a disabling condition. Now, is there her fiduciary and they're out there surveilling her? Well, and they're specifically entitled to do that under the terms of the plaintiff. So as a fiduciary, they get to go around and sneak around. Well, I think they have to make a judgment with respect to whether any individual is disabled. Don't you usually rely on medical examinations and reports for that? Well, those medical reports were provided to her, and there's information in the claim file. It's in the record before the court to indicate that they simply didn't think that an appropriate amount of medical information was supplied by plaintiff or her treating physicians with respect to their conclusions that she was disabled. They did reach the – they stated a conclusion that she was disabled, but they did not provide what MetLife believed to be adequate foundation for those conclusions. So they did make – Why didn't you get your own doctor, get an IME? Well, that's something that they could have done. And actually – So they went out and did a surveillance on her? Yes. And, Your Honor, perhaps prior or subsequent to the regular case, which is discussed at some level in the briefs, that may have not been a significant factor. After the regular case, but before the Nord decision, which overruled regular, the treating physician's opinions were entitled to greater weight. Upon Nord, that treating physician rule went out the door. And so that's one of the factors that very well could have weighed in MetLife's decision during the – prior to the – or during the course of the underlying litigation. Let me ask you this. Was there a – we do have the district court's judgment from when the district court sent it back. Yes. But was there an opposition to the motion for summary judgment filed? Here is the procedure, Your Honor. And if the court reviews that judgment, here's what you'll see. Originally, Judge Raffiti said, grants the motion for summary judgment as plaintiff as to the liability issue, but if you read down, I believe, in paragraph four, it points out that MetLife had stipulated prior to briefing that plaintiff would be – would receive benefits. And so that issue was technically moot. The only issue that was in play at the time of the underlying judgment, or the judgment in the underlying case, was the issue of whether she was entitled to benefits – or, I'm sorry, the amount of her benefits. And as to that issue, the court found that MetLife had not had an opportunity to perform a – So if I were to scour the district court file, I wouldn't find kind of what was the motivating factor that allowed MetLife – or that prompted MetLife to stipulate. Well, no. I think you'd be left to have to make some – to leap to some conclusions about that. But there – by the same token, the record doesn't show that there were any – there was any factual changes in her condition. No. I think the – in fact, if there was a change, then presumably the change would have gone from a determination that she was not disabled to a determination that she was disabled. But there were no additional medical records that were supplied that gave them the basis for that conclusion. Okay. The condition that she was – or alleging constituted her disabling condition seemingly remained constant, with the exception that when she initially went out on disability, I don't believe she was pregnant. She subsequently became pregnant, and that prevented her from taking medications, which may have ameliorated some of her symptoms. I gather – I don't know how to – I don't know if I'm using the correct terminology, but this is not a – this is not a self-funded plan. This is a fully insured plan. And so all the assets of MetLife are there to back up this plan. That is my – well, presumably. All of the assets are there. Well, it's a billion-dollar corporation, right? Insurance company. That gets into, frankly, issues that I'm not particularly well-versed in with respect to reserves and so forth. But it's a wealthy – Well, it's – there's no question that if there's a judgment in the case, that MetLife is obligated to pay the judgment. So it's – certainly MetLife has – Well, I guess my real question was getting at if you had to pay these benefits in this amount to Ms. Hockenstein, that this is not going to jeopardize the benefits to other members of the plan. Well, I don't know that – Maybe in the future they may say, well, we're going to exclude this. Right. I think – So this never happens again. Well, certainly. I think it changes things. But then I guess they wouldn't be – I guess they wouldn't be – the employees wouldn't be any worse off because – Well, my understanding, by the way, Your Honor, is that with respect to this plan, MetLife is no longer the insurance carrier that underwrites the disability benefits of this particular plan. Okay. But assuming that they were, I don't know that a decision in this case would prevent them from paying other current eligible plaintiffs who are entitled to benefits under the terms of the plan. And presumably there may be some other Robert Half employees who are still insured through MetLife. Counsel, Mr. Fleischman takes the view that the plain language of the plan, recognizing the plan consists of multiple documents that have to be construed together, but that the plain language of the plan clearly provides that any amount of money stated on the W-2 form must be factored in to her total income and then divided by 12 to get her monthly income for purposes of determining her disability benefits. As a fallback position, Mr. Fleischman takes the view that if the plain language of the documents all read together doesn't lead to that conclusion, then at most there's an ambiguity, that reasonable people could conclude that, but there might be alternate reasonable explanations. But under Ninth Circuit authority and the contra profferendum rule, the court must take a reasonable interpretation favorable to the insurer. How exactly do you respond to that? I mean, what is your argument that there's an overwhelming basis in the documents leading to the conclusion that stock options should be excluded? Well, first of all, there are several forms of compensation in the documents that are specifically included, and stock options are not one of them. Second, the second part of your question relates, goes back to the standard of review issue. If the standard of review is an arbitrary and capricious standard of review, then the contra profferendum, I would disagree with Mr. Fleischman's interpretation of the contra profferendum rules, and the Winters v. Costco case holds that even in an insured context, the contra profferendum doctrine does not apply, provided that there is discretion appropriately conferred upon the plain fiduciary. So that's, with respect to that latter issue, especially Mr. Fleischman and I have a very significant difference of opinion as to what the law provides for. I see that my time has expired, so unless the Court has any further questions of me, I will submit. Excuse me. Mr. Fleischman, many people believe that justice delayed is justice denied. Would Ms. Hawkins' dean be seriously inconvenienced if, and I'm not suggesting this is likely, but if the panel were to consider the Commissioner of Insurance's recent action of such significance as to warrant a vacating of the judgment and remanding to the trial court in this case to independently determine whether the discretionary clauses are unconscionable, would Ms. Hawkins' dean be adversely affected by such a remand? I'm going to be very candid. This matter has been going for close to six years now, and this lady was earning about $150,000. Now she's down to $152 a month. If justice requires that she wait, she'll wait, but inconvenience, yes. I must be candid. With regard to Winners v. Costco that Counsel mentioned, Winners v. Costco involved a self-funded program, plan. It was not an insured plan, and it held in that case contraproforandum did not apply. It did not hold Patterson v. Hughes was arbitrary and capricious review in an insured plan, and it held that contraproforandum applied. With regard to Document 116 that Counsel referred to in the excerpts of record, and that Judge Pires mentioned was not confidential, I don't even have it in my supplemental excerpts of record. So apparently, whoever put together, I go from 115 to 117. I was looking all over for it. It was confidential. It must have been confidential. Have you attempted to mediate this or discuss settlement of this case? I mentioned to Counsel on the way in here that absolutely nobody has ever contacted me with any offer of anything. So I was very. And I recognize insurance companies rarely do, but would the parties be willing to go to Ninth Circuit mediation? I think we went through that. You did go through that to Novell. Yes. I think we went through that before we filed the briefs. Okay. But you didn't actually meet. You just they extended their services to you, or did you meet? Oh, no. I don't remember. Did we talk? I believe we did. We had telephone. We do it on the telephone because the man's in San Francisco. With regard to the argument that the definition includes bonuses and overtime, but doesn't include stock options, Counsel here has argued in his brief on page 7 that the basic monthly earnings listed on the employer's statement was based on commission. Now, the definition of basic monthly earnings includes earnings from bonuses and overtime. It doesn't include commission. And it doesn't say commission and it doesn't say stock options. But yet they're willing to consider commission, but not stock option. So their argument doesn't make sense. Further, there's another point. The document they used to obtain the number that they eventually used to formulate her benefit can be found at Supplemental Excerpts of Records, page 73. And page 73, in the middle of the page, it asks, and Herbert Half, the company, filled this out and sent it back to MetLife, asked for her basic monthly earnings. And they gave a number of $2,541.67. But it says basic monthly earnings, parentheses, excluding overtime and bonus. So if the plan says that basic monthly earning includes overtime and bonus, and they ask the employer, what is her basic monthly earning excluding overtime and bonus, they're asking for the wrong number. They didn't care what her earnings were. They didn't care what the right number was. They just didn't want to pay her what the plan said they were supposed to pay her. They used an irrelevant number, asked an answer that they got an answer to an irrelevant question, and then applied it to her, and there's no basis for it at all. Whatever Herbert Half thought about the meaning of its plan or whatever really is irrelevant, because the plans, as Your Honor pointed out, the plan is really the documents, the summary plan description and the plan itself, and the information that's given to the beneficiary, not some hidden, unknown thought process by the employer. These people, the Viscano opinion, one of the concurring opinions of Viscano says people work for, these are not, this isn't largesse by the employer that he gives it out to employees out of the goodness of his heart. He gives out these bonuses and these plans and these protections of disability and everything else to keep the good employees. This is part of the salary that people work for. These plans, and these plans have meaning to the people that get them, and the meaning that they see on the paper, not some hidden interpretation that Herbert Half might have had that was never communicated to her. I think, oh, and also I had argued in my brief that these stock options very well fit under the idea of a bonus, and bonus is included in the W-2, in the definition of the benefits. So this could, these are bonuses to her. One more thing. On the original case, there never was a medical review of her condition done by MetLife after she did the administrative appeal. They never, ever, ever had a doctor review the medical records, let alone examine her, after she had the administrative review. They had nothing. There was, so Black and Decker and Regula, those cases don't have anything to do with this, because Black and Decker says when there's a conflict between a non-treating doctor and a treating doctor, they can take either opinion, whichever opinion they want. But this is not a case where there was a conflict between a treating doctor and a non-treating doctor. They had no doctor. Nobody ever reviewed her medical records. So that reason that we changed our mind because of the Black and Decker case, that doesn't apply at all because of Regula. Thank you. Thank you, counsel. Hockenstein v. Metrolife is submitted, and this session of the court is adjourned.
judges: Wardlaw, Paez, Singleton